# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

No. 01-11589
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOHN TURNER,

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Northern District of Texas

_____

January 27, 2003

Before KING, Chief Judge, and DeMOSS, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

John Turner ("Turner") appeals his conviction for violating 21 U.S.C. § 846, participating in

a conspiracy to distribute over 100 kilograms of marijuana, and a separate count under 21 U.S.C. §

846, for a separate conspiracy to distribute over five kilograms of cocaine. On appeal, Turner argues

that the district court erred by: (1) ruling that there was sufficient evidence to support a finding that

Turner conspired to distribute more than five kilograms of cocaine; (2) applying a 2-level increase

to Turner's offense level based on the five kilograms of cocaine allegedly involved in the conspiracy;

and (3) applying a sentencing enhancement for Turner's role as an "organizer, leader, manager, or

supervisor" under U.S.S.G. § 3B1.1.  We disagree and affirm.

## I.  BACKGROUND

Over a two-year period, various law enforcement agencies jointly investigated an alleged drug conspiracy located in Arlington, Texas.  The conspiracy began in January 1997 and continued until November 8, 2000.  Two businesses were tied to the drug conspiracy as legitimate fronts for the drug distributors.  The first business, "That Sounds Good," was a car stereo shop owned by one of the alleged co-conspirators, Nathan Henderson ("Henderson").  Turner owned the second business, "Platinum Sounds," a CD store located adjacent to Henderson's stereo shop in the same strip mall.  Henderson, Turner, and a third alleged co-conspirator, Julius Robinson ("Robinson"), organized a scheme to sell and distribute marijuana to Turner's friend in Missouri, Alex Jones ("Jones").

Henderson and Turner typically shipped and received packages containing controlled substances from their business location in the strip mall.  They received packages containing drug money at the same location, and on some occasions, at Turner's home address.  Leteisha Barnett ("Barnett"), an employee of Platinum Sounds and That Sounds Good, signed for the packages on behalf of Henderson and Turner when they came to the store.  In exchange for lending Barnett money for her apartment, Henderson enlisted Barnett to store marijuana in her apartment.  Turner, Henderson, and Robinson would often go to Barnett's apartment to package and store marijuana, and Henderson eventually had her lease a storage unit for the marijuana.  On at least a few occasions, Turner had Barnett deliver packages of marijuana to the UPS facility at the Dallas-Fort Worth Airport.

Alleged co-conspirator, Victor Jiminez ("Jiminez"), was one of the major suppliers of marijuana to Henderson and Robinson, and was the cocaine supplier to Robinson.  Jiminez sold

2

Turner and Henderson a total of nearly 2,000 pounds of marijuana. Jiminez recalled selling cocaine to Robinson three or four times, for a total quantity of approximately four kilograms. According to Jiminez, Robinson also asked to purchase cocaine from him on three or four other occasions, but he was unable to satisfy Robinson's request. On one of these occasions, Robinson requested one-half of a kilogram of cocaine, but Jiminez refused because he normally only dealt in kilogram quantities. During these transactions, the alleged co-conspirators used certain code words. For instance, to refer to one kilogram of cocaine, they would use the terms, "the other" or "a T-shirt".

In June 2000, a series of phone calls took place between Turner and Robinson and between Robinson and Jiminez. The Government intercepted and recorded the calls. The DEA case agents who listened to all of the intercepted calls found that Turner's conversation with Robinson about cocaine and Turner's conversation with Henderson about marijuana demonstrated his familiarity with the other's drug-dealing terminology and that it appeared to be more than just an isolated transaction.[1] As a result of these conversations, law enforcement obtained a search warrant for

---

[1]To support this assertion, the Government offered the following series of calls:

First Call: 5:03 p.m.
Turner: I said, them niggas [unintelligible] my other shit?
Robinson: Uh, shit. Yeah, I think so, man. Uh, uh, but you gotta have cash in hand though, before I even call 'em.
      * * *
Turner: [Unintelligible] like a half, and I need to check the uh, numbers on it, man.
Robinson: Okay, uh, let me, let me call him and see. Alright?
Turner: A'right.

Second Call: 6:16 p.m.
Robinson: I got . . . I got a dude down here man, one of my homies down here man, want a half a t-shirt.
Jiminez: Uh, but my homeboy, he's out of town right now.
Robinson: Yeah?
Jiminez: Yeah, but uh . . . I could probably check with my cousin on that.
Robinson: Yeah, check on that for me. So, it's for sure this time, it's cash at hand, I just want to know what the ticket is.
Jiminez: Okay.

Turner's residence. When executed, the search netted guns, cell phones, and $8,500 in cash, but no illegal substances.

Turner was indicted with thirty-six other people. The indictment ultimately charged Turner, in count 1, with participating in a conspiracy to distribute over 100 kilograms of marijuana in violation of 21 U.S.C. § 846,[2] and in count 2, with a separate conspiracy to distribute over five kilograms of cocaine in violation of 21 U.S.C. § 846.[3]

Turner waived his right to trial by jury. At trial, several co-defendants testified that Turner was involved in selling marijuana. While none of the co-defendants testified that they had personal

---

Robinson: You don't know what the ticket is?
Jiminez: No, I sure don't, I'll give him a call right now.
Robinson: Okay.

Third Call: 7:22 p.m.
Robinson: Hello?
Turner: So what he say, man?
Robinson: He's supposed to be giving me a call back, man. He checking on the prices.

Fourth Call: 7:31 p.m.
Robinson: What's up, Vic?
Jiminez: Nothin' much, dawg. They got some but it don't all come back, it don't drop.
Robinson: It don't?
Jiminez: Naw, it's good for the other.
Robinson: Oh, okay. Well, thanks for telling me, man.

Fifth Call: 7:35 p.m.
Turner: Yeah.
Robinson: Hey, has . . . he . . . he called me back, man.
Turner: Okay.
Robinson: He say . . . he said it he ain't coming back, man.
Turner: Oh, okay.
Robinson: It's good for tootin', and that's it. You know what I'm saying? So . . .
Turner: Huh?
Robinson: I say . . . he said it's just good for tootin'. It . . . it ain't good for cooking[.]
Turner: Yeah.

[2]The penalty for this offense is found at 21 U.S.C. § 841(b)(1)(B).

[3]The penalty for this offense is found at 21 U.S.C. § 841(b)(1)(A).

4

knowledge of Turner selling cocaine, Henderson revealed that he heard from Robinson (who did not testify at Turner's trial) that Turner was involved in selling cocaine. Another individual testified that Turner would refer persons in search of cocaine to Robinson.

The district court convicted Turner on both counts. In Turner's Presentence Report ("PSR"), the Probation Office made the following findings: (1) Turner was responsible for approximately 2,600 kilograms of marijuana, resulting in a base offense level of 32;[4] and (2) Turner's management of Leteisha Barnett warranted a two-level increase for his role as an "organizer, leader, manager or supervisor."[5] Turner's total offense level of 34 combined with his Category IV criminal history score resulted in a guideline imprisonment range of 210 to 262 months. The court sentenced Turner to: (1) 262 months in prison on counts 1 and 2 (to run concurrently); (2) five years of supervised release on counts 1 and 2; and (3) a special assessment of $200. He timely filed a notice of appeal.

## II. ANALYSIS

### A. Sufficiency of the Evidence to Support the Cocaine Conspiracy Conviction

1. *Standard of Review*

This Court's standard of review in "evaluating the sufficiency of the evidence supporting a conviction after a bench trial is whether the finding of guilt is supported by substantial evidence, i.e., evidence sufficient to justify the trial judge, as the trier of fact, in concluding beyond reasonable doubt that the defendant is guilty." *United States v. Mathes*, 151 F.3d 251, 252 (5th Cir. 1998). This Court should not weigh evidence, nor should it determine the credibility of witnesses; this Court must "view

---

[4]See U.S.S.G. § 2D1.1(c)(4). The PSR attributed 1,600 kilograms of marijuana and 5 kilograms of cocaine to Turner. The PSR converted the 5 kilograms of cocaine to 1,000 kilograms of marijuana, resulting in a total of 2,600 kilograms of marijuana.

[5]See U.S.S.G. § 3B1.1(c).

all evidence in the light most favorable to the government and defer to all reasonable inferences drawn by the trial court." *Id*. This Court will acquit a defendant if "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence." *United States v. Brown*, 186 F.3d 661, 664 (5th Cir. 1999).

2. *Discussion*

On appeal, Turner asserts that the Government did not provide an adequate factual basis to support his conviction of conspiracy to distribute more than five kilograms of cocaine. According to Turner, the evidence does not demonstrate: (1) an agreement between Turner and Robinson existed to distribute more than five kilograms of cocaine; (2) that Turner knew of any such agreement pertaining to more than five kilograms of cocaine; or (3) that Turner voluntarily participated in the distribution of more than five kilograms of cocaine. Conversely, the Government contends that given its burden of proof under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the evidence was sufficient to show that Turner was guilty of conspiring to distribute cocaine, and that the conspiracy involved more than five kilograms of cocaine.[6] The Government maintains that it is sufficient for it to prove that the conspiracy as a whole involved more than five kilograms of cocaine, despite the lack of evidence that Turner was directly involved with the requisite amount of cocaine. Turner contends that even given this reframing of the issue, the Government only has evidence of 4.5 kilograms of cocaine, and the evidence supporting an additional amount of cocaine is legally insufficient.

To prove that a defendant is guilty of conspiring to distribute illegal drugs under 21 U.S.C.

---

[6]To support its contention, the Government points to evidence that they recorded Turner seeking one-half of a kilogram of cocaine from Robinson, who, in turn, sought to buy it from Jiminez. Jiminez, in turn, testified that he sold Robinson at least four kilograms and discussed the sales of many more possible kilograms with him.

§ 846, the Government must prove beyond a reasonable doubt: "(1) the existence of an agreement between two or more persons to violate narcotics laws, (2) knowledge of the conspiracy and intent to join it, and (3) voluntary participation in the conspiracy." *United States v. Peters*, 283 F.3d 300, 307 (5th Cir.), *cert. denied*, 122 S.Ct. 2612 (2002). The Government need not prove an overt act to show participation in a conspiracy. *United States v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994). Mere presence or association alone, however, are not sufficient to prove participation in a conspiracy. *Id.* at 1551 (citing *United States v. Cardenas*, 9 F.3d 1139, 1157 (5th Cir. 1993)). Nevertheless, a court may consider a defendant's presence or association with a conspiracy as evidence of participation along with other circumstantial evidence. *See Cardenas*, 9 F.3d at 1157. "As long as it is not factually insubstantial or incredible, the uncorroborated testimony of a co-conspirator, even one who has chosen to cooperate with the government in exchange for non-prosecution of leniency, may be constitutionally sufficient evidence to convict." *United States v. Westbrook*, 119 F.3d 1176, 1190 (5th Cir. 1997).

In this case, because the indictment alleges Turner's involvement in a conspiracy to distribute a quantity greater than five kilograms of cocaine, thereby triggering punishment within the statutory range of 21 U.S.C. § 841(b)(1)(A), a fourth element applies under *Apprendi*. *United States v. DeLeon*, 247 F.3d 593, 596 (5th Cir. 2001) (citing *United States v. Doggett*, 230 F.3d 160, 164-65 (5th Cir. 2000) ("If the government seeks enhanced penalties under 21 U.S.C. § 841(b)(1)(A) or (B), the [drug] quantity must be stated in the indictment and submitted to the [fact finder] for a finding of proof beyond a reasonable doubt.")).

Turner maintains that the Government failed to carry its burden of proof with regard to the fourth element by failing to show that more than five kilograms of cocaine were attributable to

Turner's participation in the conspiracy. The Government submits that this case raises an issue of first impression in this circuit: whether in drug conspiracies post-*Apprendi*, the drug quantity element must be proven as to each alleged co-conspirator or whether it merely must be proven to the conspiracy as a whole. This issue is dispositive because, while there is legally sufficient evidence linking the entire conspiracy to more than five kilograms of cocaine, evidence linking Turner directly to that amount is non-existent.

a. The Government's Burden of Proof under *Apprendi*

The First Circuit addressed the precise issue of whether the Government has to prove that the requisite drug quantity is attributable to an individual co-conspirator in *Derman v. United States*, 298 F.3d 34 (1st Cir. 2002). In *Derman*, the habeas petitioner alleged that the court violated *Apprendi* because the jury charge should have submitted to the jurors not only the question of drug quantity vis-a-vis the conspiracy but also the "individualized question of what drug quantity was attributable to him as a coconspirator." *Id.* at 42. The First Circuit disagreed with the petitioner's broad interpretation of the Government's burdens under *Apprendi*.

Harmonizing *Apprendi* with the Supreme Court's earlier decision in *Edwards v. United States*, 523 U.S. 511 (1998), the *Derman* court expounded upon the substance of the government's burdens in conspiracy cases post-*Apprendi*:

> [I]n a drug conspiracy case, the jury should determine the existence *vel non* of the conspiracy as well as any facts about the conspiracy that will increase the possible penalty for the crime of conviction beyond the default statutory maximum; and the judge should determine, at sentencing, the particulars regarding the involvement of each participant in the conspiracy. This means that once the jury has determined that the conspiracy involved a type and quantity of drugs sufficient to justify a sentence above the default statutory maximum and has found a particular defendant guilty of participation in the conspiracy, the judge lawfully may determine the drug quantity attributable to that defendant and sentence him accordingly . . . . The rule, then, is

8

> that the government need only allege and prove to the jury the bare facts necessary to increase the statutory sentencing maximum *for the conspiracy as a whole*.

*Derman*, 298 F.3d at 42-43 (emphasis in original) (citations omitted). The *Derman* court determined that *Apprendi* error did occur, not because the charge did not instruct the question of drug quantity attributable directly to the petitioner, but because the jury was not instructed to determine the quantity of marijuana plants involved in the conspiracy. *Id.* at 43.

Applying the *Derman* rule to this case, the Government's burden was to prove the existence of a conspiracy, Turner's involvement in it, and the requisite drug quantity (here, more than five kilograms) involved in the conspiracy beyond a reasonable doubt. Once the Government makes this showing, at sentencing, it need only prove the drug quantity attributable to Turner by a preponderance of the evidence (provided that his sentence falls within the statutory maximum made applicable by the fact finder's conspiracy-wide drug quantity determination).[7]

b. Sufficiency of the Evidence

Realizing the exact nature of the Government's burdens, substantial direct and circumstantial evidence exists to support the district court's finding of a drug conspiracy under § 846. *See generally*, *United States v. Greenwood*, 974 F.2d 1449, 1457 (5th Cir. 1992) ("Because secrecy is the norm in an illicit conspiracy, the elements of the offense may be established solely by circumstantial evidence.").

First, the Government provided circumstantial evidence of an agreement between two or more

---

[7]It is also instructive that, even after *Apprendi*, this Court has not required the Government to individually attribute the requisite drug quantity to each co-conspirator, and has affirmed drug conspiracy convictions based on the Government attributing the requisite drug quantity to the drug conspiracy as a whole. *E.g.*, *United States v. Baptiste*, 309 F.3d 274, 278 (5th Cir. 2002).

persons to violate federal narcotics laws. As "[t]he gravamen of a drug conspiracy offense is the agreement to violate a drug law[,] [a]n express, explicit agreement is not required; a tacit agreement will suffice." *Id.* The Government's proffered evidence showed that Jiminez sold distribution quantities of cocaine to Robinson and on other occasions, Robinson unsuccessfully requested additional quantities of cocaine from Jiminez. This evidence is sufficient to demonstrate at least a tacit agreement to violate federal narcotics laws.

The taped telephone conversations provide sufficient evidence to satisfy the final two elements of a drug conspiracy. The Robinson-Turner and Robinson-Jiminez conversations suggest that Turner made a request for cocaine from Robinson (knowing that Robinson could respond to his request); that Turner knew that Robinson received the cocaine from a third party; and that Turner was familiar with the terms of transactions under the Robinson-Jiminez agreement. Turner, Robinson, and Jiminez communicated over the phone in such a manner that it circumstantially demonstrates knowledge of the agreement.

Turner's voluntary participation in the agreement is also evident. Given that "[c]oncert of action may indicate . . . voluntary participation" in a drug conspiracy, *United States v. Quiroz-Hernandez*, 48 F.3d 858, 866 (5th Cir. 1995), Turner's request for cocaine from Robinson represents the type of concerted action that would indicate Turner's voluntary participation in the conspiracy.[8]

---

[8]In its brief, the Government relies on the "slight evidence" rule in arguing that Turner was a voluntary participant in the drug conspiracy. This Court overruled the "slight evidence" rule in United States v. Malatesta, nevertheless, this test persistently reappears. 590 F.2d 1379, 1382 (5th Cir. 1979) (en banc) ("The 'slight evidence' rule as used and applied on appeal in conspiracy cases since 1969 should not have been allowed to worm its way into the jurisprudence of the Fifth Circuit. It is accordingly banished as to all appeals hereafter to be decided by this court."). When reviewing the sufficiency of the evidence to support any criminal conspiracy conviction, the standard of review is clearly based on *substantial* evidence, viewed in the light most favorable to the Government. *Id.*

The only debatable issue regarding the district court's finding of guilt is whether there is substantial evidence to establish that the drug conspiracy involved more than five kilograms of cocaine. The Government only provided direct evidence of the involvement of 4.5 kilograms of cocaine. The conspiracy's tie with Robinson is critical here. The Government asserts that Jiminez and Robinson's conversations about transactions that did not materialize create the inference that the conspiracy involved at least five kilograms. We agree. Because Jiminez dealt in one-kilogram quantities only, any additional request by Robinson of Jiminez would have pushed the total drug quantity involved in the conspiracy over five kilograms. Viewing the evidence in the light most favorable to the Government, which this Court must do, the inference that more than five kilograms were involved is reasonable. Therefore, the evidence was sufficient to show Turner's involvement in a conspiracy in which more than five kilograms of cocaine were involved.

## B. Turner's Base Offense Level and Sentencing Enhancements

### 1. *Standard of Review*

This Court reviews for clear error a district court's factual determination regarding, for sentencing purposes, the quantity of drugs used to establish a base offense level, *United States v. Johnston*, 127 F.3d 380, 403 (5th Cir. 1998), and whether a defendant was an organizer, leader, manager, or supervisor in the commission of the offense, *United States v. Thomas*, 120 F.3d 564, 574 (5th Cir. 1997). The district court's findings of fact can be reversed only if this court finds clear error. *E.g.*, *United States v. Richardson*, 943 F.2d 547, 549 (5th Cir. 1991). Such fact findings are not clearly erroneous if they are "plausible in light of the record as a whole." *Johnston*, 127 F.3d at 403.

### 2. *The 2-Point Increase to Turner's Base Offense Level*

11

Turner contends that, based on the trial testimony and the information on which the PSR relies, the district court erred in imposing a 2-point increase to his base offense level for his alleged involvement with five kilograms of cocaine. He maintains that, under U.S.S.G. § 1B1.3, the distribution of five kilograms of cocaine, which the PSR counted as 1,000 kilograms of marijuana, was outside the scope of relevant conduct attributable to him. At most, Turner contends, only one-half of a kilogram of cocaine could actually be attributed to him. Turner does not argue, however, that the district court erred in attributing 1,600 kilograms of marijuana to him. The Government concedes that it was error to hold Turner responsible for five kilograms of cocaine. Notwithstanding this error, the Government contends that the sentence should be affirmed because the error had no effect on his base offense level, and therefore was harmless.

When determining the base offense level of a co-conspirator, the Sentencing Guidelines' "reasonable foreseeability" requirement necessitates a consideration of when the co-conspirator joined the conspiracy, what drug quantities were within the scope of the conspiratorial agreement, and of those drug quantities, the quantities that were reasonably foreseeable, prospectively only, by the defendant. *United States v. Carreon*, 11 F.3d 1225, 1236 (5th Cir. 1994). "'The base offense level of a co-conspirator at sentencing should reflect only the quantity of drugs he reasonably foresees it is the object of the conspiracy to distribute after he joins the conspiracy.'" *Id.* (quoting *United States v. O'Campo*, 973 F.2d 1015, 1025-26 (1st Cir. 1992)).

As the Government concedes, because of the scant evidence indicating that Turner was involved with five kilograms of cocaine or reasonably foresaw that the object of the conspiracy was to distribute that particular quantity of cocaine, the district court clearly erred in attributing five kilograms of cocaine to Turner.

12

The critical question, then, is whether the district court's attribution of the cocaine quantity to Turner warrants a reversal of the court's application of a base offense level of 32. Significantly, the court also found that 1,600 kilograms of marijuana could be directly attributed to Turner. Such a finding is not clearly erroneous. Consequently, Turner suffered no prejudice as a result of the district court's erroneous factual finding with regard to the cocaine; because even if the five kilograms of cocaine (equivalent to 1,000 kilograms of marijuana) were subtracted from the overall drug amount, a base offense level of 32, which covers a range from 1,000 to 3,000 kilograms of marijuana, would still apply. *See* U.S.S.G. § 2D1.1(c)(4) (2001). Because the district court's error was harmless, we affirm its application of a base offense level of 32.

3. *Sentencing Enhancement for Turner's Role in the Conspiracy*

Finally, Turner contends that the district court erred by increasing Turner's base offense level by two points for his role as an "organizer, leader, manager, or supervisor" in the marijuana conspiracy under U.S.S.G. § 3B1.1(c). Turner argues that he was not a manager or a supervisor because: (1) Barnett's participation in the conspiracy originated with Henderson's request–not Turner's; and (2) Turner did not "profit more" than anyone else from Barnett's participation in the conspiracy. The Government maintains that the district court did not clearly err in finding that Turner had a managerial or supervisory role in the conspiracy because the evidence showed that: (1) Turner directed the activities of Barnett in sending and accepting packages for him concerning his marijuana distribution; (2) Barnett stored marijuana for Turner; and (3) Turner paid Barnett for these services.

Based on the evidence, the district court did not clearly err in finding that Turner could be characterized as having a managerial or supervisory role in the marijuana conspiracy under § 3B1.1(c). When the evidence demonstrates that a defendant directed another in his drug trafficking

13

activities, as Turner directed Barnett in numerous ways, sentence enhancement under § 3B1.1(c) is appropriate. *United States v. Posada-Rios*, 158 F.3d 832, 881 (5th Cir. 1998). As the commentary to § 3B1.1(c) explains, "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." As such, it is still possible to characterize Turner as a manger or supervisor even though Henderson initially recruited Barnett and materially benefitted from her storage of the marijuana. Therefore, the district court did not clearly err in enhancing Turner's sentence for his role as a manager or supervisor in the marijuana conspiracy.

## III. CONCLUSION

For the foregoing reasons, we conclude that the district court did not err in finding that there was sufficient evidence to show that Turner was involved in a conspiracy to distribute more than five kilograms of cocaine, and that Turner was a manager or supervisor in the marijuana conspiracy under § 3B1.1(c). While the district court clearly erred in attributing five kilograms of cocaine to Turner for purposes of sentencing, the error was harmless. We therefore affirm.